COURT OF APPEALS OF TENNESSEE

AT KNOXVILLE

FILED

July 6, 1998

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| JACQUELINE SUE ROGERS | ) | HAMILTON COUNTY |
| | ) | 03A01-9707-CV-00249 |
| Plaintiff-Appellee | ) | |
| | ) | |
| | ) | |
| v. | ) | HON. ROBERT M. SUMMITT, |
| | ) | JUDGE |
| | ) | |
| SAMUEL L. BANKS and CATHY | ) | |
| J. STANCIL | ) | |
| | ) | REVERSED, DISMISSED |
| Defendants-Appellants | ) | and REMANDED |


E. BLAKE MOORE and JOHN B. BENNETT OF CHATTANOOGA FOR APPELLANTS

KATHRYN R. LEIDERMAN OF JASPER and JOHN O. WIGGINS OF RINGGOLD, GEORGIA FOR APPELLEE


O P I N I O N


Goddard, P.J.


        Samuel L. Banks, a doctor, and Cathy J. Stancil, a nurse, appeal a jury verdict rendered against them in favor of their former patient, Jacqueline Sue Rogers.  Ms. Rogers brought two actions of medical malpractice in the Hamilton County Circuit Court.  One action was brought against Dr. Banks, her treating physician.  The other action was brought against Nurse Stancil.  Nurse Stancil performed the majority of the procedure in

question. Judge Robert M. Summitt denied motions for directed verdict after Ms. Rogers presented her case and again after Dr. Banks and Nurse Stancil presented their case. Both actions were submitted to the jury. The jury returned a general verdict against both Dr. Banks and Nurse Stancil for $60,000. Dr. Banks and Nurse Stancil both filed motions for judgments notwithstanding the verdict as well as motions for a new trial. Judge Summitt overruled these motions and upheld the jury award. We now reverse the judgment below and dismiss both suits with prejudice.

Dr. Banks and Nurse Stancil present 22 issues on appeal. However, we only need to decide two issues to dispose of this appeal. These two issues are (1) whether the Trial Court erred in submitting Dr. Banks' case to the jury in the absence of expert testimony that he violated a recognized standard of acceptable professional practice and that any medical negligence on his part was the proximate cause of Ms. Rogers' injury which would not otherwise have occurred; and (2) whether the Trial Court erred in submitting Nurse Stancil's case to the jury in the absence of expert testimony that she violated a recognized standard of acceptable professional practice and that any medical negligence on her part was the proximate cause of Ms. Rogers' injury which would not otherwise have occurred.

Ms. Rogers sought to have spider veins removed from her legs. Dr. Banks agreed to perform this service employing

2

a procedure known as sclerotherapy. Sclerotherapy basically involves using a very tiny needle superficially to inject a minuscule amount of hypertonic saline into the spider vein which pushes the unsightly blood out of the veins and causes the veins to deteriorate, resulting in their no longer being visible. Dr. Banks initially examined Ms. Rogers and advised Nurse Stancil which spider veins should be injected. Nurse Stancil performed all of the injections administered. The removal of spider veins is usually performed in sessions. Each session cannot be conducted within either two to four weeks of another session. Ms. Rogers' first session occurred on March 30, 1994. She had multiple injections on that day without incident. Ms. Rogers returned to have other spider veins treated in the same manner two weeks later, on April 13, 1994. The injury giving rise to this suit resulted from this session.

The same method and technique of injecting the spider veins was used in both sessions. After Nurse Stancil had completed all the injections on April 13, 1994, she wrapped Ms. Rogers' legs in an Ace bandage, standard procedure for all spider vein treatment sessions. However, Ms. Rogers soon began complaining to Nurse Stancil that her legs were burning and that she felt strange. Nurse Stancil unwrapped the Ace bandage and noticed that Ms. Rogers was having an adverse reaction to the injections. Nurse Stancil immediately requested that Dr. Banks come to the treatment room. Dr. Banks immediately arrived at the treatment room and examined the injection sites. He noted that

3

one of the sites was grossly different from all the others. Dr. Banks then injected ten cubic centimeters of Xylocaine, a novocaine type solution, into the injured area. He then massaged the area for a minute or two. Ms. Rogers remained at Dr. Banks' office until the pain subsided. She subsequently began to develop a deep ulcer at the site of the injection that went awry. Ms. Rogers suffered for several months and underwent two surgeries in order for the ulcer to heal.

Several doctors testified as experts during the trial. Each of the doctors testified that the cause of the ulcer was that a small amount of the injected hypertonic saline had gone deeper than the superficial area of the skin, where spider veins are located. After the solution reached the deeper arteries, these arteries deteriorated. Due to this deterioration, the surrounding flesh died, creating the ulcer. This process is referred to in the medical community as a vasospasm. Only two plausible explanations were presented at trial as to how this solution reached the deeper arteries. The first is that Nurse Stancil directly and negligently injected an arteriole. The second theory is that the solution reached the underlying artery through the occurrence of an AV fistula.

An AV fistula, arteriovenous anastomosis, is an anatomical condition where a direct connection exists between a very small vein, such as a spider vein, and a very small artery. This connection bypasses the capillary network which usually

4

separates the small veins from the small arteries. AV fistulas are exceedingly rare physical anomalies. The existence of an AV fistula can only be determined through use of a microscope during an autopsy. Thus, the existence of this condition is impossible to detect by health care providers. If an AV fistula did exist in Ms. Rogers' leg, no doctor could have determined that she had the condition. Also, an ulcer will result if an AV fistula exists even if a spider vein injection is properly performed according to the recognized standard of acceptable professional practice, also known as the standard of care.

Each doctor testified that it is impossible to determine exactly how the solution reached the arteriole. Dr. Robert E. Clark, Ms. Rogers' expert, testified that the ulcer probably resulted from the direct injection of the solution into an arteriole while providing no support for his opinion. However, he later testified that the ulcer could have occurred due to an AV fistula. Dr. Clark had no criticism of Nurse Stancil's technique. He only criticized Nurse Stancil due to her lack of knowledge about potential complications resulting from the spider vein treatment.

Nurse Stancil testified as to the technique she used on Ms. Rogers. Dr. Clark testified that the technique was within the standard of care. Other doctors testified that if the procedure was performed as Nurse Stancil had testified, the ulcer could only have been caused by an AV fistula. Dr. Banks also

testified that it is impossible to inject an arteriole just under the skin since they are seven times smaller than the needle used and invisible to the naked eye. Dr. Banks further testified that the bigger arteries are below the skin surface and "much, much deeper than we can go with our needle [used in the spider vein treatment]."

The only issues, as previously noted, that must be addressed are whether Dr. Banks and Nurse Stancil committed medical malpractice. In Tennessee, plaintiffs have a heavy burden to prove that a health care provider committed medical malpractice. T.C.A. 29-26-115 provides the necessary elements that plaintiffs must show in order to prevail in a medical malpractice action. This statute provides that:

> (a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b)[qualified experts]:
>
> (1) The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;
>
> (2) That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and
>
> (3) As a proximate result of the defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

T.C.A. 29-26-115(a). All three elements must be shown by a preponderance of the evidence for a plaintiff to prevail. T.C.A. 29-26-115(d). The statute also provides that there "shall be no

6

presumption of negligence on the part of the defendant" due to the fact of injury alone.  T.C.A. 29-26-115 (c) & (d).

Dr. Banks and Nurse Stancil contend that Ms. Rogers failed to show two of the required elements.  They argue that Ms. Rogers did not show a deviation from the recognized standard of acceptable professional practice or that any medical negligence was the proximate cause of Ms. Rogers' injury which would not otherwise have occurred.

In Ward v. United States, 838 F.2d 182 (6th Cir.1988), the 6th Circuit Court of Appeals summarized its understanding of the Tennessee rule as to violation of standard of care.  The Tennessee Court of Appeals, in Hurst by Hurst v. Dougherty, 800 S.W.2d 183, 185 (Tenn.App.1990), subsequently adopted the Ward summary of the law as follows:

> [A] physician's duty is to exercise reasonable care and
> diligence.  He must exercise his best judgment
> regarding treatment, and is not guilty of malpractice
> if he chooses a course of treatment supported by other
> physicians in good standing.  Truan v. Smith, 578
> S.W.2d 73, 75-76 (Tenn.1979).  A physician is not the
> insuror of the patient; he is only liable for
> negligence, and negligence is not presumed from the
> fact that the treatment is unsuccessful.  Liability for
> malpractice depends on whether or not the physician is
> lacking in and fails to exercise the reasonable degree
> of learning, skill, and experience that is ordinarily
> possessed by others of his profession.  Watkins v.
> United States, 482 F.Supp. 1006, 1012 (M.D.Tenn.1980).

In Ward, the doctor accidentally injected Teflon paste too deeply into an artery.  This accident caused the patient to

7

suffer a stroke.  There was no question in the case that the doctor's act was the proximate cause of the injury.  However, the Court held that the doctor was not liable since he exercised due care in making the injection.

Dr. Banks trained Nurse Stancil for an extended period of time.  He required her to use specific procedures whenever she performed spider vein injection treatments.  These procedures are customary in the field for the removal of spider veins.  Dr. Clark testified that it was acceptable to have a nurse perform the injections if properly trained, so long as the doctor is in charge and available for immediate consultation.  Drs. Banks, Rodney Susong, and John Cranwell all testified that it is within the standard of care for a nurse to perform spider vein injections.  Allowing nurses to perform these injections is allowable so long as the nurse possesses the training and skill to recognize when a complication has occurred and immediately notifies the supervising doctor of any such complications.  We cannot require nursing personnel to possess all the training of medical doctors.

Further, several doctors testified that it was within the standard of care for hypertonic saline to be used in the spider vein treatment.  Hypertonic solution is actually the most commonly used solution in performing this procedure.  This is the case even though the Food and Drug Administration has not approved the use of the solution in sclerotherapy.  Ms. Rogers

8

presented no proof that use of this solution violated the standard of care.

Ms. Rogers also contended that Dr. Banks violated the standard of care by not taking adequate counter-measures. Dr. Clark testified that an appropriate counter-measure is vigorously massaging the area of a vasospasm. Dr. Cranwell also testified that vigorous massage and injecting Xylocaine were both appropriate counter-measures and within the standard of care. Drs. Susong, Cranwell, and Banks further testified that no counter-measures taken could stop the vasospasm nor the resultant ulcer. Thus, Dr. Banks' actions were within the recognized standard of acceptable professional practice.

Dr. Banks' actions, with regard to Ms. Rogers' spider vein treatment, did not violate the recognized standard of acceptable professional practice. This conclusion is supported by all the expert testimony proffered at trial. Ms. Rogers presented no material evidence to the contrary. Therefore, we hold that Dr. Banks did not commit medical malpractice because Ms. Rogers did not introduce proof as to each of the three required elements under T.C.A. 29-26-115. The Trial Court's decision to submit the case to the jury is overturned and the claim is accordingly dismissed.

We now turn our attention to Ms. Rogers' medical malpractice claim against Nurse Stancil. Ms. Rogers initially

argued at trial that Nurse Stancil violated the recognized standard of acceptable professional practice. Nurse Stancil testified that she used the same procedure on Ms. Rogers as she had on every other spider vein treatment patient. In the spider vein treatment, Nurse Stancil and Dr. Banks use a bent needle so the needle is parallel to the skin. Nurse Stancil testified that one can actually see the needle in the spider vein since it is so close to the surface of the skin. Nurse Stancil and Dr. Banks also use a test to determine if the needle is in the vein. Nurse Stancil testified that she injects a small amount of air into the vein to insure the needle is in the vein. When she injects the air, blood comes out of the injection site, insuring the practitioner that the needle is in the vein. Immediately after injecting the air and without removing the needle from the vein, the hypertonic saline solution is injected into the spider vein to complete the treatment.

As already noted, Nurse Stancil testified that she uses this procedure on every spider vein injection she performs and did so with Ms. Rogers. Each of the experts, all doctors, testified that Nurse Stancil's technique was properly within the standard of care and that it was also within the standard of care for nurse practitioners to perform these injections. No expert testimony was presented by Ms. Rogers that Nurse Stancil deviated from the standard of care. Thus, Nurse Stancil's actions taken with regard to Ms. Rogers were well within the standard of care.

Ms. Rogers claimed in the alternative that not knowing all potential complications of the spider vein treatment was a violation of the standard of care. Two experts testified that a practitioner performing the spider vein treatment must know all potential complications and appropriate counter-measures. Other doctors testified that it was within the standard of care if a nurse did not know all potential complications or the counter-measures on one condition. This condition is that the nurse have the requisite skill to recognize when a complication is occurring, even if the nurse does not know the source of the actual complication, and that the supervising doctor be nearby and available for immediate consultation. Thus, a contradiction in expert testimony was presented as to what the actual standard of care was for nurse practitioners performing spider vein treatments. While we are inclined to hold that a nurse is not required to possess all the knowledge of a medical doctor, we do not need to decide the issue. Even if Nurse Stancil's actions violated the standard of care, Ms. Rogers failed to prove that Nurse Stancil's actions were the proximate cause of Ms. Rogers' injury and that it would not otherwise have occurred.

While the injury obviously resulted from the injection, this does not satisfy the proximate cause requirement set forth in T.C.A. 29-26-115. Ms. Rogers must produce proof that as a proximate result of Nurse Stancil's negligent act or omission, Ms. Rogers suffered injuries which would not otherwise have

11

occurred.  T.C.A. 29-26-115(a)(3).  Ms. Rogers' proof must include this element for her to prevail in her medical malpractice action against Nurse Stancil.  As set forth above, Ms. Rogers presented no material testimony that Nurse Stancil acted negligently in performing the injections other than an unsupported statement by Dr. Clark, Ms. Rogers' expert, that the vasospasm probably resulted from an injection of hypertonic saline into an arteriole.  However, Dr. Clark's hypothesis loses its validity in light of Nurse Stancil's unimpeached testimony to the contrary.[1]  Moreover, Dr. Clark later conceded that Ms. Rogers' injuries could have resulted from the existence of an AV fistula.  Other doctors confirmed that if an AV fistula did exist, Ms. Rogers' injuries would have resulted irrespective of any negligence on the part of Nurse Stancil.  In addition, Dr. Cranwell testified that if Nurse Stancil performed the injections as she testified, then the only way Ms. Rogers' injury could have occurred is by the existence of an AV fistula.  Dr. Clark also testified that he had no criticism of Nurse Stancil's technique. Since Ms. Rogers failed to prove that the injury would not otherwise have occurred in the absence of negligence and since she failed to prove that Nurse Stancil acted negligently, we hold that Nurse Stancil's action was not the proximate cause of Ms. Rogers' injury.

---

[1]      For example, in a case by a policyholder suing an insurance company for proceeds of a fire insurance policy, expert testimony that the fire was probably caused by spontaneous combustion is trumped by direct proof that the policyholder lit the fire which consumed the insured property.

Ms. Rogers also proffers the position that Nurse Stancil's failure to know the source of the vasospasm or appropriate counter-measures was a proximate cause of Ms. Rogers' injury. However, Drs. Banks, Susong, and Cranwell testified that no counter-measures could have prevented Ms. Rogers' injury. Further, we believe that lack of knowledge of counter-measures could be a proximate cause of injuries in some cases. However, since no counter-measure could have prevented Ms. Rogers' injury, we hold that Nurse Stancil's lack of knowledge of counter-measures was likewise not the proximate cause of Ms. Rogers' injury.

One final issue needs to be addressed. Dr. Banks and Nurse Stancil insist that because they were entitled to a reversal of the Trial Court's judgment against them and dismissal of Ms. Rogers' complaint, the award of discretionary costs was improper. On the other hand, Ms. Rogers insists that such an award was proper because a verdict was rendered in her favor. In light of our disposition of the principal issue raised in this appeal, which results in dismissal of Ms. Rogers' complaint, the award of discretionary costs is also reversed.

For the foregoing reasons the judgment below is reversed and Ms. Rogers' claim dismissed. The cause is remanded for collection of costs below, which are, as are costs of appeal, adjudged against Ms. Rogers.

_____
Houston M. Goddard, P.J.

CONCUR:

_____
Herschel P. Franks, J.


_____
William H. Inman, Sr.J.